## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| NORMA E. TIETJEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 11-CV-182-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Norma E. Tietjen ("Tietjen"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Tietjen appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Tietjen was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

Tietjen was 35 years old at the time of the hearing before the ALJ on August 3, 2009. (R. 32). She graduated high school and had about two years of college. (R. 33). She testified that she had served in the navy as an aviation machinist mate in 1994 and 1995, and she was discharged and given a 10% service-connected disability due to an injury to her knee. (R. 33-34).

According to Tietjen's testimony, she had last worked at a temporary agency in 2007 and left

when she was assaulted.  (R. 34-35).  She had not attempted to return to work since that time due

to her injury and her inability to leave her house.  (R. 35).

Tietjen testified that she injured her shoulder when she was assaulted in 2007.  (R. 35-

36).  She saw Dr. Trinidad for that injury approximately ten to twelve times.  (R. 36).  She

testified that she could not raise her arm due to the injury.    *Id.*  She could pick up small objects,

but her grasp was limited.  (R. 37).  Because she had often dropped and broken plates, she used

paper or plastic plates.  (R. 38).  She described her inability to grasp as a numbness and tingling.

*Id.*  She testified that she had been diagnosed with Ehlers-Danlos syndrome,[1] fibromyalgia, and

Raynaud Phenomenon[2] and that her fingers were numb and turned black.    *Id.*  She testified that

the phenomenon of her fingers turning black was due to reduced oxygen flow, and she had to

wear gloves in the summertime.  (R. 37-38).  Her hands turned black every day.  (R. 38).  She

said that she had an ulcer on her right index finger, and if it got worse and did not heal, it might

have to be amputated.    *Id.*  She saw Dr. Edwards, her neurologist, Dr. Calvin, her

rheumatologist, and Dr. Trinidad.    *Id.*

Tietjen testified that she used a cane and had been told to do so by the surgeon who

operated on her left knee, as well as by Dr. Calvin and Dr. Edwards.  (R. 41).  Her left knee was

---

[1] Hereinafter referred to as "EDS," Ehlers-Danlos syndrome is "a group of inherited disorders of the connective tissue," with major manifestations including "hyperextensible skin and joints, easy bruisability, friability of tissues with bleeding and poor wound healing, calcified subcutaneous spheroids, and pseudotumors."  "Friable" means "easily pulverized or crumbled." Dorland's Illustrated Medical Dictionary 757, 1854 (31st ed. 1990).

[2] Raynaud Phenomenon is manifested by "intermittent bilateral ischemia of the fingers, toes, and sometimes ears and nose, with severe pallor and often paresthesias and pain, usually brought on by cold or emotional stimuli and relieved by heat."  Dorland's Illustrated Medical Dictionary 1450-51 (31st ed. 1990).

the one injured in the Navy, but her right knee also had problems because she put her weight on it to compensate for the injury to the left. *Id.* She also used a brace on her left knee. (R. 55).

Dr. Calvin, her rheumatologist, had diagnosed her with fibromyalgia. (R. 45). She had short-term memory loss, and she had been told by Saint Francis hospital that she had experienced three or four strokes. (R. 46). Tietjen testified that her neurologist had put her on a new seizure medication two months earlier, and she had only three seizures since that time. (R. 39-40).

Tietjen testified that she would have difficulty lifting five pounds. (R. 38). She knew that she couldn't lift a gallon of milk, because she had dropped many of them, so her mother bought half gallon sizes. (R. 39). She could only sit for about ten to fifteen minutes before she would need to get up. *Id.* She said that she could stand for only fifteen minutes before she would experience severe pain, which she described as "everywhere." (R. 43). She could stand for a total of twenty minutes to an hour and a half during an eight-hour day. (R. 43-44). She estimated that she could sit for a total of three hours a day, but she did not know if she could do that five days a week. (R. 44). She testified that she could only walk 30 feet. (R. 45). She had trouble with bending. (R. 55-56).

Tietjen testified that she had a driver's license, but she quit driving three months earlier due to a seizure. (R. 47). She had a handicapped placard for her car. (R. 50).

Her mother cooked dinner for her and her two children. (R. 48). Her mother did the grocery shopping and took Tietjen to her doctor's appointments. (R. 51). Tietjen testified that she spent most of her day lying in bed, watching television or trying to read. (R. 50). Her son cleaned the house and mowed the yard. (R. 56). She folded the laundry, but her son did all of the other laundry tasks. *Id.*

Tietjen testified that she did not leave her house since she was assaulted at work in 2007.

(R. 51).  She testified that she had been assaulted numerous times previous to the 2007 incident. *Id.*

She had been seeing a counselor twice a week since February 2009.  (R. 52).  The counselor was treating Tietjen for post traumatic stress disorder ("PTSD").  *Id.*  She was taking medication, but it did not seem to get rid of her problems with PTSD and anxiety.  (R. 53).

Manuel J. Calvin, M.D., practiced rheumatology with Warren Clinic and treated Tietjen from 2004 through 2010.  (R. 210-83, 326-57, 459-532, 536-84).  Many of the records from Dr. Calvin consist primarily of hand-written notes and are difficult to decipher.  *Id.*  On August 16, 2004, Dr. Calvin diagnosed Tietjen with fibromyalgia, EDS, Raynaud Phenomenon, and positive ANA.[3]  (R. 356).  Tietjen saw Dr. Calvin on April 12, 2005 for follow up of her fibromyalgia. (R. 262).  Dr. Calvin's assessments were fibromyalgia, EDS, hip pain, and panic attack.  *Id.*  He appears to have injected Tietjen's sacroiliac joint.  *Id.*  Tietjen saw Dr. Calvin on May 24, 2005 for follow up of her fibromyalgia, and his assessments included fibromyalgia and irritable bowel syndrome.  (R. 233-36).  Tietjen returned for a follow-up appointment on July 20, 2005, and Dr. Calvin's assessments included fibromyalgia, EDS, irritable bowel syndrome, and Raynaud Phenomenon.  (R. 237-40).

Tietjen saw Dr. Calvin on October 10, 2005, and she complained that her pain level was high and her feet were swollen.  (R. 241-44).  Dr. Calvin made a note that Tietjen was working full time and had to walk a lot.  (R. 241).  Dr. Calvin's assessments included fibromyalgia, EDS, leg and foot pain, and Raynaud Phenomenon.  (R. 244).  Tietjen returned on December 19, 2005.

---

[3] ANA stands for antinuclear antibodies which are "almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma (systemic sclerosis), Sjögren syndrome, and mixed connective tissue disease."  Dorland's Illustrated Medical Dictionary 102 (31st ed. 1990).

(R. 245-48).  On examination, Dr. Calvin noted positive Raynaud Phenomenon in both hands, and edema in both ankles.  (R. 247).

Tietjen saw Dr. Calvin on February 27, 2006, and assessments included EDS, Raynaud Phenomenon, positive ANA, restless leg syndrome, and chronic abdominal pain.  (249-52).  Tietjen returned on May 8, 2006, with numbness and tingling in her hands and pain in her hip.  (R. 327-30).  It appears that Dr. Calvin injected Tietjen's sacroiliac joint.  (R. 329-30).

Tietjen saw Dr. Calvin on August 18, 2006 for follow-up of her EDS and fibromyalgia.  (R. 230-32).  On November 3, 2006 Dr. Calvin's assessments were EDS, fibromyalgia, restless leg syndrome, depression, and weight gain.  (R. 226-29).  He ordered an x-ray and adjusted Tietjen's medications.  *Id.*  Tietjen saw Dr. Calvin on December 27, 2006, with a chief complaint of a shooting pain down her left leg.  (222-25).  Dr. Calvin's assessments appear to have included EDS, knee pain, and fibromyalgia, and he appears to have ordered an orthopedic consult and a gastrointestinal consult.  (R. 225).

On referral from Dr. Calvin, John R. Hood, M.D., with Gastroenterology Specialists, Incorporated, saw Tietjen on January 23, 2007 for dyspepsia and abdominal discomfort.  (R. 201-04).  Dr. Hood described Tietjen as "very complex" and said that she "has a lot of psychosocial issues, as well as psychosomatic complaints but also has some real pathology conditions, as well, making it very difficult to ascertain what is what."  (R. 201).  He listed eleven medications Tietjen was taking, and he said that the medications could be part of her issues of dyspepsia and abdominal discomfort.  (R. 201-02).  He recounted numerous diagnostic tests that had been done.  (R. 202).  Tietjen had endorsed almost all of the symptoms that Dr. Hood had on his gastrointestinal checklist.  (R. 203).  Dr. Hood recommended an esophagograstroduodenoscopy ("EGD"), although he did not believe that Tietjen had a primary pathologic gastrointestinal

problem that was causing her symptoms. (R. 204). Dr. Hood performed the EGD on February 27, 2007. (R. 207-08). His impression was chronic active gastritis with erosions and healing prepyloric gastric ulceration, and he thought it could be induced by nonsteroidal anti-inflammatory medications ("NSAIDS"). (R. 208). A CLO[4] test done on biopsy tissue was positive, and it appears that Dr. Hood prescribed medication for that. (R. 206). He also recommended proton pump inhibitor therapy and minimal NSAID use. (R. 208).

Tietjen saw Dr. Calvin on March 30, 2007 for a follow-up visit. (R. 218-21). Dr. Calvin's assessment was EDS, osteoarthritis, and fibromyalgia. (R. 221). Tietjen returned on April 13, 2007 with left shoulder, arm, and hip pain after having fallen out of bed that morning. (R. 214-17). Dr. Calvin made a note that Tietjen's heartburn and indigestion was better. (R. 215). On examination, Dr. Calvin made notes regarding Tietjen's shoulder, arm, and hip, and he noted that she was limping on her left leg. (R. 216). Dr. Calvin prescribed medication and ordered x-rays. (R. 217).

Tietjen saw Dr. Calvin on May 8, 2007 for a chief complaint of having sprained her knee two days earlier. (R. 210-13). On examination, Dr. Calvin found positive trigger points, and he also made notes regarding the range of motion of Tietjen's knees. (R. 212). On June 22, 2007, Dr. Calvin's assessments appear to have included fibromyalgia, chronic pain, and depression. (R. 488-91). Tietjen returned on July 16, 2007 for follow-up of her EDS and knee pain. (R. 484-87). Dr. Calvin's assessments were fibromyalgia, chronic pain, knee pain/sprain, sleep

---

[4] A CLO test detects "Campylobacter-like organism." Dubois A. Spiral Bacteria in the Human Stomach: The Gastric Helicobacters. Emerg Infect Dis. 1995, Sep. Available from http://wwwnc.cdc.gov/eid/article/1/3/95-0302.htm. Campylobacteriosis is a bacterial infection that is usually an intestinal condition, with some infections particularly seen in immunocompromised persons. Dorland's Illustrated Medical Dictionary 279 (31st ed. 1990).

disturbance, and migraine headache. (R. 487).

Gerald A. Snider M.D. evaluated Tietjen on August 2, 2007 for worker's compensation purposes after Tietjen was injured at her place of employment in an altercation with a prospective client. (R. 379-82). At the time of the evaluation, Tietjen complained of marked pain in her lower abdomen, chest, left arm, right shoulder, back, and neck. (R. 379). Tietjen said that her worst pain was in her right arm, and she could not use that arm, including an inability to reach in any direction. *Id.* Dr. Snider reviewed x-rays of Tietjen's spine and right shoulder and found them to be unremarkable. (R. 362). Dr. Snider recommended physical therapy, home physical therapy, pain medication, and rest. (R. 382). He considered Tietjen to be temporarily totally disabled until further notice. *Id.*

It appears that Tietjen either saw Dr. Calvin or called him on August 2, 2007 to tell him about the July 30 incident and her increased pain, and Dr. Calvin prescribed additional pain medication. (R. 494).

Tietjen saw Janan R. Lane, D.O. at Concentra Medical Centers on August 3, 2007 regarding her arm injury from the July 30 incident. (R. 386-88). Dr. Lane said that Tietjen had been terminated from her work. (R. 386). Dr. Lane noted that Tietjen was emotionally variable during the visit, and her behavior included crying, agitation, and expressions of anger. (R. 387). He considered her conversation to be "flighty" or manic at times. *Id.* He stated that Tietjen's affect was "bizarre," and he said that she was anxious, confabulating, loosely associating, and displaying poor judgment. *Id.* On examination, Tietjen's right shoulder showed no deformity or swelling, but it was diffusely tender, and Tietjen would not move her arm. *Id.* Tietjen's right elbow had limited range of motion due to pain, but her other joints were all within normal limits. *Id.* Dr. Lane's assessment was shoulder strain, contusion of thigh, abdominal wall contusion,

chest wall contusion, and dysphoria. (R. 388). He wrote that he had spoken to Dr. Calvin, who advised that Tietjen's mental state as observed by Dr. Lane was similar to the mental state observed by Dr. Calvin over a period of several months. *Id.* Dr. Lane prescribed a sling for Tietjen's use. *Id.*

An MRI of Tietjen's right shoulder on August 14, 2007 showed "supraspinatus tendinitis/tendinosis" with no rotator cuff tear seen. (R. 361). The reviewing physician identified "marrow edema" in the area of the acromioclavicular joint and stated that he could not rule out an injury to that joint. *Id.*

Tietjen saw Dr. Calvin on August 15, 2007, and he noted bruising of the abdominal wall, tenderness of her chest wall, and swelling and pain of her right shoulder. (R. 480-83). He also made notes regarding Tietjen's knees, hips, and sacroiliac joint. (R. 482). Dr. Calvin's assessments were fibromyalgia and EDS, and he said that Tietjen was currently disabled. (R. 483). He also noted her shoulder and hip pain. *Id.* Her gave Tietjen injections and adjusted her medications. *Id.*

Dr. Lane saw Tietjen for a return appointment on August 16, 2007, at which time Tietjen said that her symptoms were improving. (R. 383-84). She still had tenderness of her shoulder, and Dr. Lane noted that Tietjen was not wearing her sling. (R. 383). Except for her shoulder, her joints had normal range of motion, strength, and sensation. *Id.* Assessments were supraspinatus strain and shoulder tenosynovitis. (R. 383-84). Dr. Lane referred Tietjen to an orthopedic surgeon. (R. 384). Dr. Lane stated that Tietjen's activity level should be modified, but the modifications were not spelled out in the records. *Id.*

On September 10, 2007, Kenneth R. Trinidad, D.O., board certified in internal medicine, wrote a letter to Tietjen's attorney regarding Dr. Trinidad's examination of Tietjen. (R. 358-60).

Dr. Trinidad's focus was the July 30, 2007 injury to Tietjen's right arm. (R. 358). On examination, Dr. Trinidad found tenderness over the bicipital groove, and crepitance with movement. (R. 359). He found weakness in the muscles of the shoulder girdle on the right. *Id.* He also found tenderness in Tietjen's cervical spine and her ribs "at the costochondral margin." *Id.* His impressions were right shoulder injury, cervical spine injury and chest wall contusion secondary to work-related trauma of July 30, 2007. *Id.* Dr. Trinidad stated that Tietjen was unable to perform any work activities and was temporarily totally disabled. *Id.*

David E. Nonweiler, M.D., with Central States Orthopedic Specialists, Inc., evaluated Tietjen on December 14, 2007. (R. 396-97). Tietjen said that she still had extreme right arm pain, numbness, and tingling resulting from the July 30, 2007 incident. (R. 396). She could not lift her arm at all, and she reported no treatment at all from the time of the incident. *Id.* On examination, Dr. Nonweiler said Tietjen's shoulder was diffusely weak and tender, and when he gently moved her shoulder, there was no popping, clicking, or crepitus. *Id.* He said that he had reviewed an MRI, and it was normal. (R. 397). He assessed right shoulder strain, and he explained to Tietjen that he did not see a significant injury to her shoulder. *Id.* His opinion was that she would not benefit from orthopedic surgical treatment, and, although he recommended physical therapy, he was pessimistic that this would improve her shoulder. *Id.*

Tietjen had another MRI study of her right shoulder on February 8, 2008, and the reviewing physician's impression was mild to moderate supraspinatus tendinosis, with no frank tear identified. (R. 409). X-rays of her knees done on February 12, 2008 showed an unremarkable image of her right knee, and minor arthritis in her left knee. (R. 406).

Tietjen saw Dr. Calvin on May 9, 2008, and on examination he noted swelling of her left knee. (R. 476-79). His assessments were EDS, PTSD, positive ANA, chronic anxiety disorder,

and chronic joint pain, and he adjusted Tietjen's medications. (R. 479).

Tietjen saw Muhammad Afzal, M.D. at OU Physicians - Tulsa Family Medicine clinic (the "OU Clinic") on June 13, 2008. (R. 455-58). It was stated that she came to establish care to replace Dr. Calvin due to a change in insurance. (R. 456). While getting Tietjen's medical history, Dr. Afzal noted that Tietjen was anxious, shaky, and distracted, and he said that she had "shift of ideas" and was a poor historian. *Id.* On examination, he noted that Tietjen's extremities had no swelling or cyanosis, and he said that Tietjen was anxious, easily distracted, and hyperactive, and had poor concentration and memory. (R. 457). Dr. Afzal listed his impressions as generalized anxiety disorder, ADD, fibromyalgia, and GERD, and he asked Tietjen to schedule a longer appointment to discuss her needs and medications in more detail. (R. 457-58). He agreed to give her a one-month refill on her medications. (R. 458).

Dr. Trinidad wrote another letter to Tietjen's attorney, apparently in the worker's compensation proceeding, on August 18, 2008 after examining Tietjen. (R. 413-17). On examination, her right shoulder was tender over the bicipital groove, there was crepitance in the shoulder, and there was weakness in the muscles of the shoulder girdle on the right. (R. 414). Tietjen also had tenderness and spasm in her cervical and thoracic spine. *Id.* Dr. Trinidad believed that maximum medical recovery had been achieved, although he believed that Tietjen might require surgery in the future. (R. 416). He considered her to be temporarily totally disabled from July 30, 2007, until the date of the letter. *Id.* He evaluated Tietjen as 21 percent permanent partial impairment contributed by injury to the right shoulder, 15 percent contributed by injury to the cervical spine, and 2 percent contributed by injury to the thoracic spine. (R. 417).

Tietjen saw Dr. Calvin on December 10, 2008 for increased body pain, and his assessments were fibromyalgia, EDS, sacroiliac joint pain, positive ANA, and seizure disorder.

(R. 469-72).  It appears that Dr. Calvin referred Tietjen for additional testing related to her

seizures.  (R. 472).

On referral from Dr. Calvin, Tietjen saw Jeanne M. Edwards, M.D. as a new patient on

February 6, 2009.  (R. 438-43).  Dr. Edwards conducted a neurological examination and noted

that Tietjen was oriented, with no lethargy or confusion, but she frequently cried and paced.  (R.

442).  Dr. Edwards noted good and equal strength in all muscle groups, intact sensation and

perception, and normal finger-to-nose movements.  *Id.*  She described Tietjen's gait as broad-

based, but said that Tietjen's walking was inconsistent and appeared "somewhat functional at

times."  *Id.*  Dr. Edwards also noted that Tietjen had constant contortions and movements in her

muscles that occasionally went away when she was distracted.  *Id.*  Dr. Edwards also noted that

Tietjen appeared to be extremely anxious and nervous.  *Id.*  She recommended additional

studies.  *Id.*

Tietjen returned to Dr. Edwards' office on March 4, 2009, and Dr. Edwards noted that

Tietjen continued "to have choreoathetoid type movements and [bizarre] facial movements."  (R.

432).  She recounted that an electroencephalogram read by another physician showed possible

epileptiform activity, a cervical MRI showed degenerative disc disease at several levels, and

electromyogram and nerve conduction studies revealed evidence of a mild right ulnar

neuropathy.  *Id.*  On examination, Tietjen was oriented, her cranial nerve exam was intact, she

was moving all extremities well, her gait was within normal limits, and there were no signs of

cerebellar dysfunction.  *Id.*  Dr. Edwards started Tietjen on an anticonvulsant medication and

recommended that Tietjen seek psychiatric help.  *Id.*

Tietjen returned to Dr. Calvin on May 13, 2009, and he noted Raynaud Phenomenon in

examining Tietjen's hands.  (R. 460-63).  He noted that Tietjen was wearing a left knee brace.

(R. 462).  His assessments were fibromyalgia, EDS, seizure disorder, and positive ANA.  (R. 463).

Tietjen saw Dr. Afzal at the OU Clinic on May 14, 2009 for follow-up and to obtain referrals to Dr. Calvin and Dr. Edwards.  (R. 450-54).  Dr. Afzal said that Tietjen was talkative and pleasant.  (R. 451).  On examination, he noted laxity in her joints, especially her wrist joints.  (R. 452).  He said that there was no joint pain, tenderness, or deformity.  *Id.*  He said that Tietjen was wearing a left knee brace for stability, and there was no swelling or cyanosis in her extremities.  (R. 452-53).  He noted that Tietjen was anxious, easily distracted, hyperactive, and had poor concentration and memory.  (R. 453).  Dr. Afzal stated his impressions as EDS, rheumatoid arthritis, seizure disorder, fibromyalgia, and generalized anxiety disorder, and he stated that she was receiving care for these conditions from Dr. Calvin and Dr. Edwards.  (R. 453-54).

Tietjen returned to Dr. Calvin on August 13, 2009.  (R. 575-78).  On examination Dr. Calvin noted Raynaud Phenomenon, and made additional notes regarding Tietjen's lumbar spine, sacroiliac joint, left knee, and hands.  (R. 577).  Dr. Calvin's assessments included Raynaud Phenomenon, EDS, fibromyalgia, and edema and abdominal bloating.  (R. 578).  On September 9, 2009, Tietjen reported that she had fallen the day before, and Dr. Calvin also made a note that appears to state that Tietjen had experienced two seizures.  (R. 570-73).  On examination, Dr. Calvin apparently observed swelling around Tietjen's eye and a toe.  (R. 572).  He noted limited neck rotation, and his assessments included neck sprain.  (R. 572-73).  On examination on November 13, 2009, Dr. Calvin noted problems with Tietjen's joints, including her shoulders, elbows, hips, and knees.  (R. 566-69).  His assessments were fibromyalgia, EDS, and knee disorder.  (R. 569).

Tietjen returned to Dr. Calvin on June 10, 2010, and Dr. Calvin described her fibromyalgia as severe with pain in neck, mid back, low back, shoulders, hips, knees, and ankles. (R. 555-57). He said that Tietjen's EDS included joint pain, joint swelling, and widespread muscle pain. (R. 555). His assessments were EDS and unspecified rheumatism and fibrositis. (R. 556). On July 2, 2010, Dr. Calvin described Tietjen as being in moderate distress. (R. 552-54). On examination, he stated that Tietjen's left knee was tender, with severe pain on motion. (R. 553). He also noted that Tietjen had edema in her extremities. *Id.* He continued the same assessments. *Id.* On August 12, 2010, Tietjen was in no apparent distress, and her shoulders had no joint deformity, swelling, or problem with range of motion. (R. 549-51). Tietjen had sacroiliac tenderness in both hips, and tenderness in her elbows and knees. (R. 550). Dr. Calvin's assessments were unspecified rheumatism and fibrositis, EDS, and pain in the joint of the lower leg, noting chondromalacia patella. *Id.*

On October 13, 2010, Dr. Calvin described Tietjen's fibromyalgia as severe and worsening. (R. 546-48). Dr. Calvin described Tietjen as being in moderate distress, and he noted tenderness with either moderate or severe pain upon motion in most of Tietjen's joints. (R. 547). He also noted that Tietjen had injured her left shoulder and arm, and could not raise it over ninety degrees. (R. 546-47). He continued the assessment of unspecified rheumatism and fibrositis, adding a note that the "patient is 100% disabled due to her severe fatigue and pain level, requires regular use of narcotics to ease her pain." (R. 547). He continued the assessment of EDS, with a note of hyperextensible joints, and he added an assessment of unspecified disorder of the bursae or tendons of the shoulder. *Id.*

On October 18, 2010, Dr. Calvin wrote a letter "To Whom It May Concern" stating that Tietjen had severe fibromyalgia and EDS, with permanent damage in her knees and severe pain

and fatigue. (R. 542). He also noted that Tietjen had seizures frequently and saw a neurologist on a regular basis. *Id.* He stated that Tietjen was 100% disabled and unlikely to return to work. *Id.*

On November 11, 2010, Dr. Calvin completed a Physical Medical Source Statement form. (R. 543-45). He indicated that Tietjen could sit at one time for one hour, for a total of four hours in an 8-hour work day, but could only stand or walk for a total of 10-30 minutes. (R. 543). Dr. Calvin indicated that Tietjen could lift or carry up to ten pounds occasionally. *Id.* He noted no limitations in her ability to use her feet for foot controls, or in the use of her hands. (R. 544). He indicated that Tietjen could occasionally reach, but could never bend, squat, crawl, or climb. *Id.* He indicated that Tietjen had a total restriction on being around unprotected heights, moving machinery, or vibrations, and a marked restriction on exposure to marked change in temperature and humidity, dust, and driving. (R. 544-545). He wrote in spaces for objective medical findings that Tietjen had severe fibromyalgia, including tender points, and the genetic disorder of EDS that had caused arthritis in her knees and back. (R. 545).

The record contains a Mental Medical Source Statement form dated August 28, 2009, signed by Lori E. McGraw, LPC. (R. 533-35). For sixteen specific functions, McGraw checked boxes indicating that Tietjen had a severe limitation in five areas, a marked limitation in six areas, moderate limitation in two areas, and no significant limitation in three areas. (R. 533-34). In her narrative comments, McGraw stated that Tietjen was not able to maintain appropriate decision and problem-solving skills and was overwhelmed with responsibilities such as making and keeping appointments. (R. 535). She said that Tietjen's mother managed her money. *Id.*

Tietjen was given a physical consultative examination by agency consultant Ashley Noel Gourd, M.D. on June 15, 2007. (R. 285-91). Tietjen's chief complaint was Raynaud

Phenomenon, which she said kept her from performing a job that required repetitive use of her hands. (R. 285). Tietjen said she had difficulty sleeping, and she had quit working due to pain, which she described as "constant." *Id.* Tietjen reported that she completed her own activities of daily living. *Id.* Dr. Gourd noted that Tietjen was tearful, with a depressed affect and a "[w]orsening whole-body tremor as exam progressed." (R. 286). On examination, Dr. Gourd found that Tietjen moved all extremities. *Id.* Dr. Gourd noted that Tietjen was not able to pick up and manipulate paperclips, she had a hand tremor, and she dropped objects frequently. *Id.* Dr. Gourd rated Tietjen's grip strength as 3/5. *Id.* She noted that Tietjen moved around the room slowly, toe and heel walking was weak, and Tietjen had a stable gait at slow speed using a cane. *Id.* Dr. Gourd's assessments included fibromyalgia and chronic pain, noting Tietjen's multiple medications, and she said that Tietjen was "[n]ot compensating well." *Id.* Dr. Gourd said that Raynaud Phenomenon was not apparent during the exam. (R. 287). Other assessments included tobacco abuse, tremor, depression, and gastropathy. *Id.* On the range of motion forms, Dr. Gourd noted limited knee flexion and shoulder abduction. (R. 288-89). Dr. Gourd again noted Tietjen's difficulty manipulating small objects, and she stated that Tietjen could not effectively grasp tools such as a hammer. (R. 290). She noted pain on motion of Tietjen's lumbosacral spine, with no tenderness or spasm. (R. 291). She also noted weak heel and toe walking, and weak toe strength. *Id.* She found no problems with Tietjen's cervical spine. *Id.*

Luther Woodcock, M.D., a nonexamining agency medical consultant, completed a Physical Residual Functional Capacity Assessment on August 16, 2007. (R. 316-23). Dr. Woodcock determined that Tietjen had the exertional capacity to perform sedentary work. (R. 317). For narrative explanation, Dr. Woodcock wrote that Tietjen could lift or carry 5-10 pounds frequently and could stand or walk for 2-3 hours a day. *Id.* He first described Tietjen's activities

of daily living, and he then stated that x-rays of her joints had been negative.  *Id.*  Dr. Woodcock summarized a May 2007 examination by Dr. Calvin, and Dr. Gourd's consultative report.  (R. 318).  He said that his RFC was based on Tietjen's history of multiple joint pains, her reported activities of daily living, the findings of Dr. Calvin and Dr. Gourd, and the x-rays.  *Id.*  He said that pain did not further affect Tietjen's RFC.  *Id.*  Dr. Woodcock found no other limitations. (R. 318-23).

Agency consultant Linda R. Craig, Psy. D., completed a consultative psychological evaluation of Tietjen on June 13, 2007.  (R. 292-94).  Dr. Craig described Tietjen as "slightly cooperative" and "minimally engaged in the interview process."  (R. 292).  Tietjen began the interview defensively and somewhat angrily, but then cried throughout the interview, and Dr. Craig considered the validity of Tietjen's history to be questionable.  *Id.*  Dr. Craig noted Tietjen's mood as depressed and anxious and said that her thought content was "remarkable for distrust of others."  *Id.*  While Tietjen's ability to focus and to concentrate appeared normal, her immediate memory and short-term memory were compromised.  *Id.*  Judgment was fair and intelligence appeared average.  (R. 292-93).  She scored 27 of 30 on the MMSE "demonstrating short-term memory deficits."  (R. 293).  Tietjen circled every symptom on the intake sheet.  *Id.* When relating her work history, Tietjen said that she had been fired from every job because "it didn't work out."  (R. 294).  Tietjen reported staying in her house with her children, doing light housework, and leaving home by car only twice a week to make necessary errands.  *Id.*

Dr. Craig's Axis I[5] diagnoses were major depressive disorder, recurrent, severe, PTSD, and generalized anxiety disorder. (R. 294). On Axis II, Dr. Craig diagnosed Tietjen with personality disorder not otherwise specified with borderline traits. *Id.* Dr. Craig scored Tietjen's current Global Assessment of Functioning ("GAF")[6] and her highest past year GAF as 55. (R. 295). In a summary, Dr. Craig stated that there was no evidence of malingering or exaggeration. *Id.* She said that Tietjen was moderately impaired with respect to understanding complex instructions, remembering instructions, and sustaining focus and concentration. *Id.* She said that Tietjen was severely impaired with respect to social interactions with coworkers or the public. *Id.*

Nonexamining agency consultant Janice B. Smith, Ph. D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form on July 10, 2007. (R. 297-313). On the Psychiatric Review Technique form, Dr. Smith noted for Listing 12.04 that Tietjen suffered an affective disorder. (R. 300). For Listing 12.06, she noted Tietjen's anxiety and "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." (R. 302). For Listing 12.08, Dr. Smith noted personality disorder, not

---

[5] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[6] The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

otherwise specified, with borderline traits. (R. 304). For the "Paragraph B Criteria,"[7] Dr. Smith found that Tietjen had moderate restriction of her activities of daily living, marked difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with one or two episodes of decompensation. (R. 307). In the "Consultant's Notes" portion of the form, Dr. Smith noted Tietjen's claim of depression, anxiety, and PTSD, and her medical history of treatment and prescription medications. (R. 309). Dr. Smith briefly summarized Dr. Craig's consultative report. *Id.*

On the Mental Residual Functional Capacity Assessment form, Dr. Smith noted moderate limitations in Tietjen's ability to understand, remember, and carry out detailed instructions. (R. 311). She noted a moderate limitation in Tietjen's ability to accept instructions and respond appropriately to criticism from supervisors, and she said that Tietjen had a marked limitation in her ability to interact appropriately with the general public. (R. 312). Dr. Smith found no other significant limitations. (R. 311-12). In narrative comments, Dr. Smith said that Tietjen could understand, remember and carry out non-complex work instructions and could make non-complex work-related decisions. (R. 313). She said that Tietjen could interact appropriately with coworkers and supervisors in at least a superficial manner, but would have difficult interacting with the general public. *Id.* Dr. Smith concluded that Tietjen could be expected to adapt to most routine work-related changes. *Id.*

_____

[7] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

## Procedural History

On March 29, 2007, Tietjen filed an application for Title XVI supplemental security income benefits, 42 U.S.C. §§ 401 *et seq.* (R. 111-14). The application was denied initially and on reconsideration. (R. 75-81). A hearing before ALJ Charles Headrick was held on August 3, 2009 in Tulsa, Oklahoma. (R. 26-62). By decision dated October 27, 2009, the ALJ found that Tietjen was not disabled. (R. 10-23). On February 2, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-4). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[8] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[8]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Tietjen had not engaged in substantial gainful activity since her application date of March 29, 2007. (R. 12). At Step Two, the ALJ found that Tietjen had severe impairments of right shoulder pain, fibromyalgia, major depressive disorder, generalized anxiety disorder, and PTSD. *Id.* At Step Three, the ALJ found that her impairments did not meet the requirements of a Listing. *Id.*

---

shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

The ALJ found that Tietjen had the RFC to perform sedentary work with the following nonexertional limitations:

> [Tietjen] is moderately limited in her ability to understand and remember detailed instructions, moderately limited in her ability to carry out detailed instructions, markedly limited in her ability to interact with the public, and moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors. She can understand, remember, and carry out non-complex work instructions and can make non-complex work related decisions. She can interact appropriately with coworkers and supervisors in at least a superficial manner. She can be expected to adapt to most routine work related changes.

(R. 14). At Step Four, the ALJ found that Tietjen was unable to perform any past relevant work. (R. 21). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Tietjen could perform, taking into account her age, education, work experience, and RFC. (R. 21-22). Therefore, the ALJ found that Tietjen was not disabled since her application date of March 29, 2007. (R. 22).

**Review**

Tietjen asserts that the ALJ erred by failing to properly consider and evaluate medical source evidence, failing at Step Five, and failing to make a proper credibility assessment. Plaintiff's Opening Brief, Dkt. #16, p. 2. Regarding the issues raised by Tietjen, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

**Medical Opinion Evidence**

The first issue addressed by Tietjen is whether the ALJ properly considered the medical opinion evidence.[9]  Plaintiff's Opening Brief, Dkt. #16, pp. 2-5.  Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record.  *Hamlin*, 365 F.3d at 1215.  *See also* 20 C.F.R. § 404.1527(d)(2).  Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527.  *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection.  *Id.*  When a treating physician's opinion is inconsistent with other medical evidence, it is the job of the ALJ to examine the other medical reports to see if they outweigh the treating physician's report, not the other way around.  *Hamlin*, 365 F.3d at 1215 (quotation omitted).

The undersigned finds that the ALJ's analysis was adequate and supported his decision to reject Dr. Trinidad's opinion that Tietjen could not perform jobs that required repetitive work with her right arm.  (R. 20, 417).  The ALJ first explained that he gave great weight to the

---

[9] The undersigned notes that in this portion of Tietjen's argument, she did not argue that Dr. Calvin had given opinion evidence that should have been addressed by the ALJ.  Plaintiff's Opening Brief, Dkt. #16, pp. 2-5.  Any issues related to Dr. Calvin's evidence are therefore waived.  *See Wall v. Astrue*, 561 F.3d 1048, 1066 (10th Cir. 2009).

opinions of Dr. Snider and Dr. Nonweiler, because they were consistent with the medical evidence, and he said that Dr. Trinidad's opinion deviated significantly from their opinions. (R. 20). The ALJ also discussed at length the failure of the record to show that Dr. Trinidad was a treating physician, including a "lack of the longitudinal medical record" from Dr. Trinidad. *Id.* These reasons given by the ALJ were legitimate reasons for him to question the treating physician status of Dr. Trinidad and for him to discount the opinion of Dr. Trinidad that Tietjen could not perform work requiring repetitive use of the right arm. *White v. Barnhart*, 287 F.3d 903, 907-08 (10th Cir. 2001) (affirming an ALJ's decision to reject the RFC assessment of a treating physician because the physician's "examinations of Mrs. White were very limited and did not fully support the very restrictive functional assessment").

The Court notes that the ALJ also improperly questioned Dr. Trinidad's impartiality, which is a line of reasoning that has been disapproved by the Tenth Circuit. *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987). In the present case, however, the ALJ gave valid reasons for his decision to discount Dr. Trinidad's opinion, and therefore the inclusion of this improper reason is not fatal. *See Tom v. Barnhart*, 147 Fed. Appx. 791, 793 (10th Cir. 2005) (unpublished).

Tietjen makes a two-sentence argument that the ALJ's Paragraph B findings were "unexplainedly discordant" with those of Dr. Smith. The Court finds that this is not a sufficiently developed argument to be addressed by the Court. *Wall*, 561 F.3d at 1066 ("perfunctory" arguments are waived). This is also an argument that the Tenth Circuit has rejected. *See Barber v. Astrue*, 431 Fed. Appx. 709, 712 (10th Cir. 2011) (unpublished) (ALJ was not required to explain difference in severity ratings when his ultimate RFC assessment was consistent with consultant's opinion). Here, the ALJ's ultimate RFC determination was consistent with the opinions of Dr. Smith, and therefore no further explanation regarding the

differences in severity ratings in the Paragraph B Criteria was necessary.

The Court finds no error in the way the ALJ handled the Mental Medical Source Statement completed by Lori McGraw, LPC. (R. 19-20, 533-35). The ALJ noted that there was nothing in the administrative transcript that explained the duration of Ms. McGraw's relationship to Tietjen or the extent of treatment. (R. 19). He noted that there was nothing in the record to give a factual basis for the opinions given by Ms. McGraw. (R. 20). These were sufficient reasons for discounting an opinion given by an other medical source. *See Zumwalt v. Astrue*, 220 Fed. Appx. 770, 780 (10th Cir. 2007) (unpublished) (LPC was not an acceptable medical source, and ALJ's treatment of her evidence was sufficient).

Tietjen's arguments relating to the Paragraph B criteria are not persuasive. The Paragraph B Criteria are only 4 broad categories, while the Mental Residual Functional Capacity Assessment includes 20 different specific functions that are listed under headings of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." A finding of moderate limitation in concentration, persistence, or pace in the Paragraph B Criteria does not require any specific one-for-one correlation to a function on the Mental Residual Functional Capacity Assessment. *See Heinritz v. Barnhart*, 191 Fed. Appx. 718, 721-22 (10th Cir. 2006) (unpublished) (finding only three of twenty specific mental activities were impaired on the Mental Residual Functional Capacity Assessment was not inconsistent with a finding that the claimant had marked limitation of concentration, persistence, or pace on the Psychiatric Review Technique form); *Norris v. Barnhart*, 197 Fed. Appx. 771, 775 (10th Cir. 2007) (unpublished) (separate measures on Mental Residual Functional Capacity Assessment form did not conflict with examining consultant's opinion evidence).

The Court also rejects Tietjen's argument regarding the mental limitations the ALJ included in his RFC that related to coworkers. Dr. Craig, the examining consultant, said that Tietjen was severely impaired with respect to social interactions with coworkers. (R. 295). Dr. Smith addressed this concern with an affirmative statement that Tietjen could interact appropriately with coworkers in at least a superficial manner, and the ALJ adopted Dr. Smith's wording in formulating his RFC determination. (R. 14, 313). As a consulting expert, Dr. Smith was entitled to express her opinion of the best way to address Dr. Craig's concern regarding Tietjen's ability to relate to coworkers in language that she believed accurately described Tietjen's functional abilities, and the ALJ was entitled to rely on Dr. Smith's opinion. The wording difference between Dr. Craig and Dr. Smith relating to coworkers, and the ALJ's use of Dr. Smith's language, did not create reversible error.

Finally, the Court rejects Tietjen's argument regarding manipulative limitations. It is true that Dr. Gourd examined Tietjen and in her report stated that Tietjen had difficulty picking up paperclips, she had a hand tremor, and she dropped objects frequently. (R. 286). Additionally, Dr. Gourd rated Tietjen's grip strength as 3/5, and she said that Tietjen could not grasp a hammer. (R. 286, 290). Dr. Woodcock, however, in formulating the Physical Residual Functional Capacity Assessment, had information in addition to the findings of Dr. Gourd. In his narrative discussion of the evidence, he did not ignore Dr. Gourd's findings regarding Tietjen's hands, but he specifically noted the hand tremor and "decreased use of the hands." (R. 318). In addition to these findings, he noted Tietjen's activities of daily living, her medical evidence of record, and her x-rays, including the fact that x-rays of her hands and wrists were negative. (R. 317-18). Having considered all of this evidence, Dr. Woodcock then indicated that no manipulative limitations had been established. (R. 319). Dr. Woodcock was entitled to come to

this conclusion based on his review of all of the evidence, and the ALJ was entitled to rely on his opinion evidence in formulating his RFC determination. The ALJ's RFC determination was supported by substantial evidence.

**Step Five Issues**

Tietjen's primary argument regarding Step Five is her objection to the way that the ALJ propounded the hypothetical to the vocational expert (the "VE"). Instead of actually stating out loud what physical and mental limitations he wanted to include in the hypothetical, the ALJ merely handed the VE the Physical Residual Functional Capacity Assessment of Dr. Woodcock, and the Mental Residual Functional Capacity Assessment of Dr. Smith. (R. 58). This Court disapproves of this method of propounding a hypothetical to the VE:

> A complete question paired with a complete answer in the transcript is highly desirable. . . [The shortcut of using forms] too often leaves the reviewing court with difficulty in determining if the people sittiing in the hearing room all were asking questions, giving testimony, and listening to testimony regarding the same hypothetical RFC.

*Sitsler v. Astrue*, 410 Fed. Appx. 112, 120 n.4 (10th Cir. 2011) (unpublished). Nevertheless, the use of forms as a way of propounding the hypothetical to the VE has not been ruled by the Tenth Circuit to be a *per se* fatal error by an ALJ, and this Court declines to proclaim such a rule. Moreover, Tietjen does not give examples of any prejudice she suffered as a result of the ALJ's questioning of the VE.

Tietjen argues that the ALJ failed to give specific exertional abilities in his hypothetical to the VE. This argument has no merit, because Dr. Woodcock's Assessment, used by the ALJ to propound the hypothetical, indicated the specific individual components that are part of the definition of sedentary work. (R. 317). Thus, Tietjen's argument makes no sense because the strength demands of sedentary work were specifically stated in the form used by the ALJ to

communicate the RFC to the VE. The Tenth Circuit has affirmed cases where the ALJ used the defined exertional levels, rather than listing each component of the defined level, as part of the hypothetical asked of the VE. *Qualls v. Astrue*, 428 Fed. Appx. 841, 850-51 (10th Cir. 2011) (unpublished); *Rutledge v. Apfel*, 230 F.3d 1172, 1175 (10th Cir. 2000). There was no error in the way the ALJ described the exertional abilities in the hypothetical to the VE.

The remainder of Tietjen's argument in this section of her brief repeats the arguments she made relating to opinion evidence. Tietjen argues that additional limitations, such as limited use of hands, should have been included in the hypothetical to the VE. These arguments are not persuasive, because "the ALJ's hypothetical included all of the limitations he properly determined claimant to have." *Rutledge*, 230 F.3d at 1175. The Court, in the first section above, explained that substantial evidence supported the ALJ's RFC determination, and therefore he was not required to include additional limitations in his hypothetical to the VE. There was no error by the ALJ at Step Five.

**Credibility Determination**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White,* 287 F.3d at 910. In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

This reviewer states his approval of the ALJ's credibility analysis here, which was unusually detailed. (R. 15-21). The ALJ included a discussion of Tietjen's credibility after many of his paragraphs in which he summarized the medical records. For example, he summarized Tietjen's testimony regarding her use of a cane, and he noted that the medical records of Tietjen's treating physicians did not appear to include a prescription for any assistive devices. (R. 15). He then contrasted Tietjen's use of a cane with her answer to a question on an Adult Function Report, in which she stated that she had also been prescribed a walker and a wheelchair. (R. 15-16). The ALJ noted discrepancies between Tietjen's claims of injuries and x-rays or other imaging studies, such as a failure of studies of her shoulder to show a hairline fracture of her rotator cuff, as she claimed. (R. 16). The ALJ explained that Tietjen had made multiple inconsistent statements regarding her employment. For example, Tietjen had worked until the incident on July 30, 2007, but she stated in a Disability Report that she had been unable to work since February 2006. *Id.* The ALJ gave numerous examples of statements by her treating physicians regarding her abilities that were inconsistent with her own claims of more limited abilities, such as Dr. Nonweiler's statement that there was no significant injury to her shoulder. (R. 17-20). These are specific reasons that are linked to substantial evidence, and they fulfilled the ALJ's obligation regarding a finding that Tietjen was not totally credible.

Faced with the extremely thorough credibility analysis by the ALJ, Tietjen falls back on several arguments that have previously been rejected by this Court and, in some instances, by the Tenth Circuit. First, she states that the ALJ did not specify which portions of Tietjen's testimony were considered true or untrue, but there is no such requirement, as this Court explained in some detail in *Harper v. Astrue*, 2012 WL 2681292 (N.D. Okla).

Second, Tietjen notes the ALJ's use of boilerplate language relating to "objective verification" of Tietjen's activities of daily living. This Court has criticized this language and many other boilerplate provisions that are commonly used by ALJs. *See Edwards v. Astrue*, 2012 WL 1115677 (N.D. Okla.); *Schieffer v. Astrue*, 2012 WL 1582032 (N.D. Okla.); *Snyder v. Astrue*, 2012 WL 2680856 (N.D. Okla.). The Tenth Circuit has explained that boilerplate language is disfavored because it fails to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).

While boilerplate language is disfavored, here this reviewing Court has no doubt regarding the specific evidence that the ALJ considered because he gave numerous detailed and supported reasons for his credibility assessment. The boilerplate provisions that the ALJ included are not fatal to his credibility assessment because he performed an actual assessment of Tietjen's credibility, linking substantial evidence to specific reasons. *Hardman*, 362 F.3d at 678-81; *Kruse v. Astrue*, 2011 WL 3648131 at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility determination only in the absence of a more thorough analysis"). Further, the Tenth Circuit has rejected the argument made by Tietjen that the "objective verification" language imposes "an incorrect standard of proof." *Wall*, 561 F.3d at 1069-70 (language was "common sense observation" by ALJ rather than imposition of objective verifiability as standard).

Tietjen goes on to complain of the ALJ's use of activities of daily living in his analysis, making arguments that "minimal" or "sporadic" activities of daily living, including care of relatives, do not support a finding that a claimant can work on a full time basis. Plaintiff's Opening Brief, Dkt. #16, p. 7. Here, as this Court has summarized, the ALJ relied on several

different legitimate legal reasons for finding Tietjen's claim of diability to be less than fully credible, and he linked those reasons to substantial evidence. It would be difficult to characterize the ALJ's analysis as relying principally on "minimal" or "sporadic" activities of daily living. This Court rejects the argument that there was any error in the ALJ's analysis relating to Tietjen's activities of daily living, but even if there were error, it would not be fatal to a credibility assessment that was thorough and relied on multiple supported legitimate reasons. *Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007) (in spite of a legally flawed finding by ALJ, there was still substantial evidence supporting ALJ's ultimate finding); *Tom*, 147 Fed. Appx. at 793 (ALJ's improper questioning of treating physician's impartiality was not fatal to his discounting of physician's opinion when he articulated other legitimate reasons).

Counsel for Tietjen should consider being more cautious in making statements that the ALJ "miscast" the evidence, which Tietjen says he did by stating that her treatment had been generally successful. Plaintiff's Opening Brief, Dkt. #16, p. 8. Tietjen says that the ALJ's statement is wrong because her fibromyalgia was growing worse. *Id.* The difficulty is that the record cited by Tietjen is of an office visit with Dr. Calvin on October 13, 2010, and the ALJ's decision was dated October 27, 2009. (R. 546). In any event, this argument by Tietjen does not affect the sufficiency of the ALJ's credibility assessment.

Tietjen lists several pieces of evidence that the ALJ "ignored," including the fact that she was found to have a stomach ulcer. Plaintiff's Opening Brief, Dkt. #16, p. 8-9. Nothing in these records contradicts the ALJ's credibility assessment. In *Zaricor-Ritchie*, the Plaintiff made a similar argument, asserting that in assessing credibility the ALJ should have taken into account evidence of her injuries such as a broken foot and strained neck. *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 824 (10th Cir. 2011) (unpublished). The court found that evidence of these

injuries "lends no support to the credibility of her testimony regarding the severity" of other impairments. *Id.* Even if records validated some of Tietjen complaints, it does not follow that the ALJ would have been required to find that Tietjen's remaining complaints were credible.

The undersigned finds that the ALJ's credibility assessment was "closely and affirmatively linked to substantial evidence" that supported the conclusion that Tietjen was not fully credible. *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 13th day of August 2012.

Paul J. Cleary
United States Magistrate Judge